STATE of Alaska, DEPARTMENT
OF HEALTH AND SOCIAL
SERVICES, Appellant,

v.

Denise OKULEY, on behalf of herself
and all those similarly situated,
Appellees.

No. S–12971.

Supreme Court of Alaska.

June 26, 2009.

Rehearing Denied Aug. 20, 2009.

Joanne M. Grace, Assistant Attorney General, Talis J. Colberg, Attorney General, Anchorage, for Appellant.

James J. Davis, Jr., Goriune Dudukgian, Ryan Fortson, Northern Justice Project, Anchorage, for Appellees.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, CARPENETI, and WINFREE, Justices.

*OPINION*

MATTHEWS, Justice.

## I. INTRODUCTION

This appeal involves a common fund fee award to attorneys who represented, on a pro bono basis, a class of persons wrongly denied Interim Assistance benefits by the State of Alaska. As a result of class counsel's efforts, the State was required to pay $990,010 in retroactive Interim Assistance benefits to 301 class members, as well as $91,575 in prejudgment interest. The court awarded class counsel $46,131.70 in prevailing party attorney's fees under Alaska Civil Rule 82. Over the State's objection and without requiring that notice of a common fund fee request be sent to class members, the court also awarded class counsel fees from the common fund, granting counsel's request for an amount equal to the prejudgment interest, $91,575, or 9.25% of the fund. Class counsel thus received a total fee award of around $137,707. The State appeals the common fund fee award in its *parens patriae* capacity. Although we recognize that awarding fees from the fund without notice to class members of the fee request was not the best

procedure, we affirm the award because it was fair and reasonable and not an abuse of discretion.

## II. FACTS AND PROCEEDINGS

### A. Facts

In August 2005 the Northern Justice Project filed a class action lawsuit against the State of Alaska on behalf of Interim Assistance (IA) benefits applicants, alleging that an internal policy the state adopted in 2003 to save costs violated the Alaska Administrative Procedures Act (APA). IA benefits are available to Alaskans who have applied for Supplemental Security Income (SSI) benefits[1] but who have not yet received a final decision from the federal government on their SSI applications.[2] To qualify for IA benefits, a state-approved physician or psychiatrist must find the applicant disabled.[3] If the federal government finds the applicant qualifies for SSI benefits and thus begins paying such benefits, the applicant must repay the state for the IA benefits she received;[4] if she does not qualify, she is not required to repay the state.[5] To reduce the number of applicants who are not required to repay the state and thus save costs, the state implemented an internal policy change in 2003 that added a secondary disability assessment. Under the 2003 policy, if the state-approved doctor found the applicant disabled and eligible for IA benefits but a secondary "medical screener" disagreed, the state denied the application. The state did not follow the APA in promulgating this policy.

In April 2005 Denise Okuley, the named class representative, applied for IA benefits and though found eligible by the state-approved physician, was denied benefits based on the medical screener's secondary assessment. The Alaska Pro Bono Program

---

1. The SSI program and application process are governed by federal statutes and regulations. *See* 42 U.S.C. §§ 1381–1385 (2006); 20 C.F.R. §§ 416.101–416.2227 (2008).

2. *See* AS 47.25.455; 7 Alaska Administrative Code (AAC) 40.375(a), 40.140(b), 40.170(b) (2008).

3. *See* 7 AAC 40.180, 40.170(b), 40.050(c). Assistance may also be available based on age, blindness, or financial need. *See* 7 AAC 40.090. Persons found eligible for IA benefits receive $280 per month. AS 47.25.455(a).

4. *See* 7 AAC 40.375(c).

5. *See* 7 AAC 40.480(b).

(APBP) referred Okuley's case to the Northern Justice Project. APBP, Okuley, and the Northern Justice Project signed a "tripartite retainer agreement," which provided that the Northern Justice Project would represent Okuley on a pro bono basis and that "any fees awarded by [the court] at the conclusion of this case [would] be retained by APBP and the Northern Justice Project."

## B. Proceedings

Okuley moved for a preliminary injunction against the State, challenging the 2003 policy's legality. In September 2005 the superior court converted the motion into a summary judgment motion and ruled in Okuley's favor.[6] Subsequently, Okuley moved to certify the class under Alaska Civil Rule 23(b)(2).[7] The superior court certified two classes: "(1) IA applicants whose applications were denied by the State despite being found to be disabled by a state-approved doctor, but whose SSI applications were still being processed by the federal government; and (2) IA applicants whose applications were denied by the State despite being found to be disabled by a state-approved doctor, and whose SSI applications were subsequently denied by the federal government."

The parties reached an agreement as to the first class, consisting of 153 members, with the State agreeing to pay $759,930 in retroactive IA benefits.[8] Because Okuley and the State could not agree as to the second class, consisting of 237 members, Okuley moved for summary judgment, requesting that these members be awarded retroactive IA benefits. The superior court granted the motion over the State's opposition and ordered the State to pay $230,080 in retroactive IA benefits to the 167 members of this class who had responded to the State's notices.

As a result of Okuley's class action, the State was required to pay 301 class members $990,010 in retroactive IA benefits.[9] The State also agreed to pay $91,575 (9.25%) in prejudgment interest.

Class counsel moved for prevailing party fees under Alaska Civil Rule 82, as well as for "reasonable attorney's fees from the common fund." The State did not oppose the Rule 82 motion, and the court awarded $46,131.70 in prevailing party fees. The State did oppose counsel's request for fees from the common fund, arguing that (1) the doctrine should not apply to public benefits cases, and (2) the hourly rate claimed by counsel was unreasonable as compared to the hourly rate the State's attorneys are paid. In requesting common fund fees, class counsel urged the court to use the percentage of the fund method[10] and to award fees in an amount equal to the prejudgment interest, $91,575, or 9.25% of the fund.[11]

6. The State subsequently rescinded the 2003 policy and, as required by the APA, noticed and held a public comment hearing prior to adopting the policy. The new regulations took effect in January 2006. *See* 7 AAC 40.180 (am. 1/11/2006, Reg. 177).

7. Alaska Civil Rule 23(b)(2) provides that a class may be certified if the four prerequisites in Rule 23(a) (numerosity, commonality, typicality, and adequacy) have been met and the "party opposing the class has acted or refuses to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

8. Payment was conditioned on the class members continuing to meet other eligibility requirements for the IA program.

9. Apparently $135,000 to $150,000 in retroactive IA benefits were never paid or claimed because class members had since died, moved out-of-state, or failed to respond to the State's notices.

10. Alaska courts may use either the percentage of the fund method or the modified lodestar method to calculate fees from the common fund. *See Edwards v. Alaska Pulp Corp.*, 920 P.2d 751, 758 (Alaska 1996). The former method involves determining a reasonable percentage using a 25% baseline that the trial court can modify depending on various factors, such as the size of the fund, "the time required to reach a settlement," and any objections by class members to the settlement. *Id.* The latter method involves calculating a lodestar figure by multiplying the number of hours reasonably spent on the case by a reasonable hourly rate and then applying a multiplier to that figure based on various factors, such as the risk in taking the case and the quality of representation. *Id.* at 757.

11. Because class counsel are both public interest attorneys, neither normally bills clients nor has standard billing rates. However, attorney Goriune Dudukgian provided in an affidavit that the fair market rate for his services would be "at least $200.00 per hour," and the other attorney,

■ The court found the common fund doctrine applied under the three-part test outlined in *Edwards v. Alaska Pulp Corp.*[12] It also found the percentage of the fund method more desirable than the lodestar method "because there is a clearly established common fund." Having so determined, the court recognized the need to "carefully evaluate the award of fees under a test of reasonableness." It listed the factors courts consider in determining a reasonable fee[13] and discussed those factors it found relevant. Based on the fact that courts often use 25% as a benchmark and on the court's finding that this case was undesirable, had "substantial risk" factors (including the contingent nature of the representation and the risk of not prevailing), and resulted in a favorable outcome for an indigent class, the court granted counsel's request for an award equal to the prejudgment interest, or 9.25% of the fund. Thus, the court awarded coun-

sel $91,575 in common fund fees, amounting to a total award of around $137,707 in fees.[14]

The State, in its *parens patriae* capacity, appeals the superior court's award of $91,575 in attorney's fees from the common fund.[15]

## III. STANDARD OF REVIEW

■ We review a superior court's decision to use the percentage of the fund method to calculate a fee award for abuse of discretion.[16] Likewise, we review an attorney's fee award for abuse of discretion, reversing the award only if it is "arbitrary, capricious, manifestly unreasonable, or the result of an improper motive."[17] But we review the court's application of the law in determining an attorney's fee award de novo, "applying 'the rule of law that is most persuasive in light of precedent, reason, and policy.'"[18] Similarly, whether a superior court has fulfilled its fiduciary duties in awarding class counsel attorney's fees is a legal question reviewed de novo.[19]

James Davis, stated in an affidavit that his would be $275 per hour. At these rates, counsel would be owed a total of $57,727.50. Setting this as the lodestar, a multiplier of about 2.4 would result in a fee award closely approximating the full amount awarded here. If the lodestar figure is $45,060.75, as the State argues it should be, the actual total fees awarded would reflect a multiplier of about three.

**12.** 920 P.2d at 756 n. 9 ("[T]he common fund doctrine is properly applied ... if '(1) the class of beneficiaries is sufficiently identifiable, (2) the benefits can be accurately traced, and (3) the fee can be shifted with some exactitude to those benefitting.'" (quoting *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 271 (9th Cir. 1989)) (internal quotation marks omitted)). Here, the court found (1) two classes of beneficiaries had been identified, the first class consisting of 153 persons and the second of 237, of which 167 responded to the notice of retroactive payments; (2) the benefits could be accurately traced because the first class received a total of $759,930 and the second group of 167 received $230,080; and (3) the fee could be shifted with some exactitude to those benefitted.

**13.** According to *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), courts should consider twelve factors in determining reasonable fee awards: (1) the "time and labor required," (2) the "novelty and difficulty of the questions," (3) the "skill requisite to perform the legal service properly," (4) the "preclusion of other employment by the attorney due to acceptance of the case," (5) the "customary fee," (6) "[w]hether the fee is fixed or contingent," (7)

"[t]ime limitations imposed by the client or the circumstances," (8) the "amount involved and the results obtained," (9) the "experience, reputation, and ability of the attorneys," (10) the "'undesirability' of the case," (11) the "nature and length of the professional relationship with the client," and (12) "[a]wards in similar cases." *Id.* at 717–19. In *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67 (9th Cir.1975), the Ninth Circuit adopted the *Johnson* guidelines. *Id.* at 70. The parties refer to these as the *Johnson–Kerr* factors and we adopt this usage. These factors are largely found in Alaska Bar Rule 35(a).

**14.** The State argues the combined awards amount to hourly rates of $727.31 and $528.95, whereas the attorneys' fair market rates are $275 and $200 per hour.

**15.** APBP has joined in Northern Justice Project's brief.

**16.** *See Edwards*, 920 P.2d at 758.

**17.** *See Hughes v. Foster Wheeler Co.*, 932 P.2d 784, 793 (Alaska 1997) (citing *Mt. Juneau Enters., Inc. v. Juneau Empire*, 891 P.2d 829, 834 (Alaska 1995)).

**18.** *Glamann v. Kirk*, 29 P.3d 255, 259 (Alaska 2001) (quoting *Philbin v. Matanuska–Susitna Borough*, 991 P.2d 1263, 1266 (Alaska 1999)).

**19.** *See In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 307–08 (3d Cir.2005) (appearing to use de novo standard to review the trial court's behavior

## IV. DISCUSSION

The State argues the superior court abused its discretion in awarding class counsel fees from the common fund for a variety of reasons; class counsel dispute each of these reasons and argue the State has waived all of its claims for failure to raise them below.

### A. The Superior Court Did Not Fail To Fulfill Its Fiduciary Duties to the Class in Awarding Class Counsel Fees from the Common Fund.

■ The State argues the court failed to fulfill its fiduciary duty to the class by choosing the percentage of the fund method and by not considering the appropriate amount of an award based on the hours worked and rates charged. We disagree.

We have recognized the "potential lack of adversity when class counsel asks the trial court to impose fees on the benefitted class members under the common fund doctrine." [20] Because of this potential lack of adversity, as well as the potential for conflicts of interest between the class and class counsel, we have explained that "[c]ourts should . . . closely scrutinize applications for attorney's fees from a fixed fund." [21]

Here, the court acknowledged its fiduciary duty to the class when it stated, "this court should carefully evaluate the award of fees under a test of reasonableness." And the court fulfilled its fiduciary duty to the class by so doing. Regarding the method of fee calculation, the court discussed how fees are calculated under both the percentage of the fund and the lodestar methods. It then concluded that because a "clearly established" fund existed, the percentage of the fund

method was more appropriate. The difficulty in calculating the fund is a factor courts may consider in determining which method of fee calculation to apply.[22] In relying on this factor, the court properly exercised its discretion and fulfilled its fiduciary duty to the class.

Likewise, the court "carefully evaluate[d]" the "reasonableness" of the percentage and fee awarded. The court considered the *Johnson–Kerr* factors,[23] analyzed the factors it found supported upward or downward adjustment—risk of nonpayment and loss, undesirability of the case, and results achieved on the one hand, and time and labor required and indigency of the class on the other—and calculated the lodestar fee amount ("about $60,000") and what the fee would be if it set the percentage at 25% versus at 9.25%. Thus, the court both recognized and fulfilled its fiduciary duty to the class to scrutinize the fee request.

### B. The Superior Court Did Not Abuse Its Discretion in Applying the Percentage of the Common Fund Method.

■ The State argues that the percentage of the fund method is inappropriate in SSI cases generally, asserting that basing the fee on the results achieved, as the percentage method does, would result in windfall fees because SSI benefits are fixed.

Again, Alaska courts have discretion to apply either the percentage of the fund or the modified lodestar methods.[24] Under the percentage of the fund method the court determines a reasonable percentage based on a 25% baseline,[25] which it modifies based on

---

as a fiduciary in evaluating a fee request in a class action settlement).

**20.** *Municipality of Anchorage v. Gentile,* 922 P.2d 248, 267 n. 28 (Alaska 1996).

**21.** *Edwards v. Alaska Pulp Corp.,* 920 P.2d 751, 756 n. 7 (Alaska 1996).

**22.** *Municipality of Anchorage v. Gallion,* 944 P.2d 436, 447 (Alaska 1997) (citing *Gentile,* 922 P.2d at 266).

**23.** *See supra* note 13 for the *Johnson–Kerr* factors.

**24.** *Edwards,* 920 P.2d at 758.

**25.** *Id.* at 758 & n. 14 (noting percentages ranging from 10% to 50% have been accepted but that the "consensus seems to be that 20% to 30% (or 19% to 33%) is normally reasonable" and the "median and the most common figure seems to be 25% of the fund").

factors such as the size of the fund and the *Johnson–Kerr* factors.[26] On the other hand, a court following the modified lodestar method first "determines the number of hours an attorney reasonably spent on the case and multiplies that number by a reasonable hourly rate."[27] The court may apply a multiplier to the lodestar amount based on factors such as "the *Johnson–Kerr* factors, the risk to counsel in taking the case, achievement of extraordinary results, the quality of representation, and substantial delay in payment."[28]

We have stated that the percentage of the fund method may be inappropriate where the attorney quickly negotiates an enormous settlement and thus stands to receive an "inordinate windfall,"[29] where there is "any difficulty in calculating the common benefit,"[30] or where the fund is enormous;[31] and the lodestar method may be inappropriate "in a case in which an attorney recovers a small fund, [causing] application of the lodestar ... to devour most or all of the fund."[32]

Advantages of the percentage method are that it tends to better reflect the results achieved[33] and to "most closely approximate[ ] the manner in which attorneys are compensated in the marketplace."[34] On the other hand, the lodestar method closely tracks the amount, though not necessarily the value, of the work done.[35] Regardless of which method a court chooses, the court "should explain the reasons behind its decision."[36]

We agree with class counsel that the court did not abuse its discretion in finding the percentage method appropriate. Here, the fund is definite—it consists of $990,010 in retroactive IA benefits plus $91,575 in prejudgment interest. The court found that because the fund is "clearly established," the percentage method was more appropriate. Again, because the difficulty in calculating the fund is an appropriate factor to consider, and because the record supports the court's conclusion, the court did not abuse its discretion in choosing the percentage of the fund method on this basis.[37]

**26.** *Id.* at 758 (also listing as factors to consider "the time required to reach a settlement, whether class members have substantial objections to the settlement terms or the fee request, non-monetary benefits conferred by the settlement, the economies of scale involved in a class action, and the structure of the settlement").

**27.** *Id.* at 757.

**28.** *Id.* (citing *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1301–05 (9th Cir. 1994)).

**29.** *Id.* at 758.

**30.** *Municipality of Anchorage v. Gallion*, 944 P.2d 436, 447 (Alaska 1997) (citing *Municipality of Anchorage v. Gentile*, 922 P.2d 248, 266 (Alaska 1996)).

**31.** *See Edwards*, 920 P.2d at 758 (discussing *In re Wash. Pub. Power Supply Sys. Secs. Litig.*, 19 F.3d at 1297, in which the percentage method was inappropriate because the fund amounted to $685 million); *see also In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 737 nn. 19 & 22 (3d Cir.2001) (stating "'$100 million seems to be the informal marker of a 'very large' settlement" and citing several cases with settlements exceeding $100 million in which courts used the lodestar method (internal quotation mark omitted) (citation omitted)).

Also, at least one court has noted the percentage method may be inadequate if multiple firms represented the class. *See In re Superior Beverage/Glass Container Consol. Pretrial*, 133 F.R.D. 119, 124 (N.D.Ill.1990).

**32.** *Edwards*, 920 P.2d at 758 n. 13 (quoting *Rawlings v. Prudential–Bache Props., Inc.*, 9 F.3d 513, 516 (6th Cir.1993)).

**33.** *Id.* (quoting *Rawlings*, 9 F.3d at 516).

**34.** *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1269 (D.C.Cir.1993).

**35.** *See Edwards*, 920 P.2d at 758 n. 13 (quoting *Rawlings*, 9 F.3d at 516).

**36.** *Id.* at 759.

**37.** *Cf. Municipality of Anchorage v. Gallion*, 944 P.2d 436, 447 (Alaska 1997) (stating that "[t]he superior court's observation about the difficulty of determining the value of the judgment remains relevant and valid," and holding the common fund doctrine did not apply).

The court's failure to discuss the other relevant factors is harmless error because all the factors support choosing the percentage method: (1) the size of the fund is just over $1 million and thus is clearly not a mega-fund; (2) the case did not settle, so there is no risk counsel pushed an early

## C. The Superior Court Did Not Abuse Its Discretion in Finding a Fee Award of 9.25% of the Fund Was Reasonable.

█ The State contends that the court abused its discretion in accepting class counsel's request for common fund fees equal to 9.25% of the fund, arguing that the court should not have awarded enhanced fees based on risk and undesirability.[38]

Again, in deciding to award 9.25% of the fund to class counsel, the superior court considered the 25% benchmark, the need to ensure the fee was reasonable, factors supporting upward and downward adjustment, the actual fees incurred, and the risks entailed. Though acknowledging the class's indigency, the court also emphasized the results achieved: "without the efforts of class counsel, the plaintiff class would have been worse off financially." After considering all of these factors, the court concluded the "factors really do not call for a departure from the 'benchmark' of 25%. Accordingly, the request for approximately 9% is clearly justified."

█ Though either the percentage or the lodestar method "may yield fees exceed-ing fees calculated on a strict hourly basis,"[39] the trial court "should exercise its discretion to avoid unjust enrichment of either counsel or beneficiaries."[40] Regardless of which method a court uses, "a 'reasonable' attorney's fee is the proper standard."[41]

We conclude awarding class counsel 9.25% of the fund was reasonable and not an abuse of discretion. The court's decision to award this percentage was neither arbitrary nor capricious: the court acknowledged its duty to "carefully evaluate" the fee request for "reasonableness" and did so evaluate it, taking into account the relevant *Johnson–Kerr* factors supporting upward and downward adjustment, calculating the lodestar figure ($60,000), and considering what the fee would be if it chose the 25% benchmark ($247,502). And though the award exceeded counsel's approximate hourly rates, we conclude the award was not manifestly unreasonable[42] when considering the policy objectives of encouraging pro bono representation and of using the class action mechanism.

We have permitted enhanced fees in both public interest and class action cases because

and large settlement to receive higher fees; and (3) only one firm represented the class.

38. The State also argues that class counsel's hourly fees were unreasonable due to failure to deduct certain entries. Because the State did not raise this argument below, we conclude the State has waived this argument on appeal. *Cf. State Commercial Fisheries Entry Comm'n v. Carlson*, 65 P.3d 851, 873 (Alaska 2003).

39. *Municipality of Anchorage v. Gentile*, 922 P.2d 248, 266 (Alaska 1996).

40. *Edwards*, 920 P.2d at 759; *see also Mac-Donald v. Weinberger*, 512 F.2d 144, 146–47 (9th Cir.1975) (noting that in determining a reasonable fee, courts face the competing considerations of ensuring "the attorney's compensation [is] sufficient to encourage members of the bar to undertake representation of disability claimants" while acknowledging that "the disability award, from which the attorney's fee is paid, is normally an already-inadequate stipend for the support and maintenance of the claimant and his dependents").

41. *Edwards*, 920 P.2d at 756; *see also id.* at 758 n. 15 ("Trial courts which elect to follow a percentage approach must exercise their independent discretion in arriving at a fair and rea-sonable fee award under the common fund doctrine.").

42. *See Municipality of Anchorage v. Gallion*, 944 P.2d 436, 447 (Alaska 1997) (explaining the compensable value of counsel's services may exceed the hours worked times the hourly rates (citing *Municipality of Anchorage v. Gentile*, 922 P.2d 248, 264 (Alaska 1996))); *Gentile*, 922 P.2d at 266.

In common fund cases in other jurisdictions, court have tended to award multipliers of two to four times the lodestar and as high as five in some circumstances. *See, e.g., In re NASDAQ Market–Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y.1998) (noting "multipliers of between 3 and 4.5 have become common" (internal quotation mark omitted) (citation omitted)); *Ressler v. Jacobson*, 149 F.R.D. 651, 654 n. 4 (M.D.Fla.1992) (explaining courts "regularly award multipliers of 2 to 3 times [the] lodestar"); *Kuhnlein v. Dep't of Revenue*, 662 So.2d 309, 315 (Fla.1995) (setting the "*maximum* multiplier available" in common fund cases at five). If we consider the award in this case as though it were calculated as a modified lodestar, the multiplier here would be between 2.4 and three; thus, it cannot be regarded as unreasonable by that measure.

of the risk of nonpayment[43] and the sound policy of encouraging capable representation.[44] In the context of workers' compensation fee awards, we have explained that the objective of ensuring that competent counsel is available to represent injured workers "would not be furthered by a system in which claimants' counsel could receive nothing more than an hourly fee when they win while receiving nothing at all when they lose."[45] We believe the same policy applies to a class action case taken on a pro bono basis and conclude the court did not abuse its discretion in finding the risk of nonpayment justified a fee enhancement.

We also conclude the superior court did not abuse its discretion in awarding enhanced fees based on the risk of not prevailing against the State. We have explained that where "the probability of success is so great at the outset that no adjustment in the base award would be appropriate," a risk multiplier should not be applied.[46] A multiplier might be appropriate when "pertinent law is unclear at the outset of a case" or "new law had to be forged or difficult burdens of proof met."[47]

Here, the court found there was a risk of not prevailing against the State, which it called a "formidable adversary," and that this risk supported enhancing the fee award. We agree. Though Okuley prevailed on the issue of whether the 2003 policy was invalid on summary judgment within one month of filing her preliminary injunction motion, the case's success hinged on certifying the class. Below, the State vigorously opposed class certification and much of the litigation concerned this issue, with both parties filing extensive memorandums. Even the State acknowledged that its motion opposing class certification was "complicated." Whether the court would certify the class was not certain. Further, even after the court certified the class, the State refused to settle the second class's claims, requiring litigation over the past-due benefits. On these facts, the court did not abuse its discretion in enhancing the fee award on the basis of uncertainty of prevailing.

The court also did not abuse its discretion in finding this case qualifies as undesirable, justifying a fee enhancement. We have encouraged courts to consider the "potential difficulty of attracting capable counsel" in determining the compensable value of counsel's services and proper fee awards.[48] Counsel "may offer affidavits asserting that it would be difficult or impossible to obtain other capable counsel absent the potential recovery of enhanced fees."[49] However, "a court need not unquestioningly accept assertions that absent enhanced fees, capable counsel could not have been retained, or

**43.** *See Era Aviation, Inc. v. Lindfors,* 17 P.3d 40, 51–52 (Alaska 2000) (citing examples to support the statement that "[t]his court has affirmed ... risk-enhanced fees only in exceptional circumstances, where there was a strong public interest involved, or the attorneys stood to receive no compensation other than the fees granted by the court," and refusing to award risk-enhanced fees where, among other things, the party had not shown that counsel would not be paid other than by court-awarded fees); *see also In re Cont'l Ill. Sec. Litig.,* 962 F.2d 566, 573 (7th Cir.1992) (discussing the importance of risk multipliers in class actions because "[i]n a class action suit, ... there is no contract between lawyer and client— no source other than the judicial award of fees to which the lawyer can look for compensation for risk of loss").

**44.** *See Era Aviation, Inc.,* 17 P.3d at 51–52 (explaining we have permitted risk-enhanced fees in cases that involve the "risk of discouraging capable counsel," and refusing to award such fees where, among other things, the party had not shown her case was "of the type that would make it difficult to attract capable counsel with-

out the potential of enhanced fees"); *Gentile,* 922 P.2d at 264 (directing the court on remand to consider "the potential difficulty of attracting capable counsel" in setting the class action fee award); *cf. Wise Mech. Contractors v. Bignell,* 718 P.2d 971, 975 (Alaska 1986) (explaining that the contingent nature of representation in workers' compensation cases makes awarding enhanced fees necessary "to ensure that competent counsel are available to represent injured workers").

**45.** *Wise Mech. Contractors,* 718 P.2d at 975.

**46.** *Thomas v. Bailey,* 611 P.2d 536, 542 (Alaska 1980) *superseded by statute on other grounds,* ch. 86, §§ 1–4, SLA 2003.

**47.** *Id.*

**48.** *Gentile,* 922 P.2d at 264.

**49.** *Id.* at 264 n. 25.

cannot be obtained in the future," because "[s]uch assertions are potentially speculative and self-serving." [50]

The court found this case "the type of case where there are few attorneys who would represent clients who have no ability to pay," concluding that without class counsel, "it is doubtful that class actions such as this one would have been pursued." Class counsel submitted affidavits attesting to the difficulty of placing cases such as this one with competent counsel. APBP Executive Director Kara Nyquist, who is responsible for recruiting private attorneys to accept pro bono cases, stated in an affidavit that "[i]t is beyond question that the lawyers in this state that handle pro bono cases will not and do not accept class actions or other complex public benefits cases." She stated that in the "almost three years" that she has been Executive Director, she has "been able to find only one firm that is willing to handle class actions or other complex public benefits cases for APBP's clients, the Northern Justice Project." Likewise, Lloyd Benton Miller, a partner in a private law firm, stated in an affidavit:

> In my experience there is an extreme shortage of attorneys in the private Bar willing to take on substantial commitments to plaintiff's work in contingent class action litigation for indigent clients. The paucity of available attorneys is even more grave in the public benefits arena, where extremely few individuals in the private Bar have any substantial expertise.

Based on this evidence, the court could reasonably find that attracting capable counsel to take this case would have been difficult and a fee enhancement was justified.

**D. The State Waived Its Argument That the Common Fund Fee Award Violated Okuley's Representation Agreement.**

■ The State contends that because Okuley's representation agreement stated she would not be charged for representation, and because class counsel received the case from APBP, whose website promises pro bono clients will not have to pay attorney's fees, the common fund fee award contradicted Okuley's agreement. The State also argues that the clause in the agreement stating that class counsel would retain court awarded fees was misleading.

■ Okuley's representation agreement is not part of the record; neither party asked the court to review the fee award for compliance with the agreement and it did not do so. Attorney Goriune Dudukgian claimed in an affidavit that the "retainer agreement signed by plaintiff Denise Okuley, the Northern Justice Project, and APBP provides that any fees awarded by this Court at the conclusion of this case shall be retained by APBP and the Northern Justice Project." Insofar as this statement accurately describes the retainer agreement, the agreement may be ambiguous as to whether a common fund fee award was contemplated or permitted. But "[a] party may not raise an issue for the first time on appeal." [51] Because the State failed to raise this argument below in its opposition to the fee request, leaving us with no record and no copy of the agreement to review, we consider this argument waived.

**E. The Fee Award Does Not Fail for Lack of Notice of the Fee Request to the Class.**

■ The State claims the common fund fee award is unfair to the class members because they did not receive notice of the fee request. It argues that because prejudgment interest had been awarded to the class members, they had "vested property rights" in that interest and constitutional due process was triggered.[52] Class counsel reply that Alaska Civil Rule 23 does not require notice because the class was certified under Rule 23(b)(2).

---

**50.** *Id.*

**51.** *Brandon v. Corr. Corp. of Am.*, 28 P.3d 269, 280 (Alaska 2001) (citing *Preblich v. Zorea*, 996 P.2d 730, 736 n. 17 (Alaska 2000)).

**52.** Constitutional due process requires notice "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

Alaska Civil Rule 23(c)(2) requires notice of class certification and opt-out rights in Rule 23(b)(3) (damages) class actions but not in Rule 23(b)(2) (injunctive or declaratory relief) or Rule 23(b)(1) (limited fund) class actions.[53]  Many federal courts have held that under Federal Rule of Civil Procedure 23(c)(2), which like the Alaska rule does not require notice of opt-out rights to members of Rule 23(b)(2) classes, due process does not require notice: "[w]hen an action is certified under Rule 23(b)(2) . . . absent class members are not required to receive notice or to have the opportunity to opt-out of the suit[;] [d]ue process requires only that the class members be adequately represented."[54] The rationale for this distinction lies in "assumptions of cohesiveness underlying [Rule 23(b)(2) and (b)(3) ] classes."[55]  The Eleventh Circuit has explained:

> At base, the (b)(2) class is distinguished from the (b)(3) class by class [cohesiveness] . . . . Injuries remedied through (b)(2) actions are really group, as opposed to individual injuries.  The members of a (b)(2) class are generally bound together through "preexisting or continuing legal relationships" or by some significant common trait such as race or gender.  Although the interests of the different members of a (b)(2) class are by no means identical the substantial cohesion of those interests makes it likely that representative members can adequately represent the interests of absent members and that the need for and interest in individual representation will be minimal.  Under such circumstances, the contribution that individual notice can make to buttressing adequate representation is not great enough to warrant a mandatory procedural or constitutional requirement.[56]

Though due process generally does not require notice of opt-out rights in 23(b)(2) actions, some federal courts have held that some form of notice should be given if potential conflicts of interest between the class representatives and unnamed class members arise.[57]  We recognize that because of the

53. Alaska R. Civ. P. 23(c)(2) ("In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."); *see also* Alaska R. Civ. P. 23(b)(1)-(3).

54. *Pate v. United States*, 328 F.Supp.2d 62, 70 (D.D.C.2004) (quoting *EEOC v. Gen. Tel. Co. of Nw., Inc.*, 599 F.2d 322, 334 (9th Cir.1979), *aff'd*, 446 U.S. 318, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980)) (internal quotation marks omitted) (alterations and omissions in original); *see also Eubanks v. Billington*, 110 F.3d 87, 92 (D.C.Cir. 1997) (stating "[a] number of courts have held that, as a general matter, due process does not require that (b)(1) or (b)(2) class members be given an opportunity to opt out" and citing cases from the Second, Fifth, Sixth, and Ninth Circuits).

55. *Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1156 (11th Cir.1983).

56. *Id.* at 1155 n. 8 (citation omitted); *see also Van Gemert v. Boeing Co.*, 590 F.2d 433, 439 n. 14 (2d Cir.1978) ("[C]lass actions certified under 23(b)(2) or . . . 23(b)(1), do not contain an opt-out privilege.  This reflects the conclusion of those who drafted the Rules that individual choice should be subordinated to the interests of the class as a whole to avoid inconsistent judgments or prejudice to absent class members. Because class certification represents a judicial determination that the absentees are adequately represented, it would frustrate the Rule if we were to require an investigation into each plaintiff's willingness to accept the benefits of the litigation."); *cf. Woodward v. Rogers*, 344 F.Supp. 974, 980 n. 10 (D.D.C.1972) (holding that "where the adequacy of the representation of the class interests by the named parties is clear, where no apparent purpose would be served by notice to this wide-ranging class even if notice were at all practicable, and where, indeed, judgment is in favor of the class, the essential requisites of due process have been met without further notice" (citations omitted)).

57. *See, e.g., Holmes*, 706 F.2d at 1159–60 (holding notice of opportunity to opt-out of settlement was required in 23(b)(2) Title VII case because the settlement included a lump-sum damages award and each class member's claim to back pay was based on unique injuries, defying the assumption of cohesiveness and generating the possibility of "antagonistic interests and conflicting concerns"); *cf. Eubanks*, 110 F.3d at 96 (holding "when a (b)(2) class seeks monetary as well as injunctive or declaratory relief" the trial court may either certify the class as a hybrid (b)(2)/(b)(3) class or "conclude that the claims of particular class members are unique or sufficiently distinct from the claims of the class as a whole" such that opt-out notices "should be permitted on a selective basis"); *Elliott v. Weinberger*, 564 F.2d 1219, 1229 (9th Cir.1977) ("Only

risk of conflicts of interest when class counsel seek fees from the common fund, notice to class members of a fee request is desirable.[58] We also note that under Alaska Civil Rule 23(d), the court could have required notice of the fee request.[59]

But the court was not required to order such notice. As class counsel point out, Alaska's Civil Rule 23 does not have a provision mandating notice of counsel's fee request. By contrast, Federal Rule of Civil Procedure 23(h)(1), enacted in 2003, requires "[n]otice of a motion [for attorney's fees and nontaxable costs] ... be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner."[60] Responding to class counsel's emphasis on this distinction, the State asserts that "Alaska's procedural rules are not congruent with constitutional due process." But Federal Rule of Civil Procedure 23(h) is not, at least explicitly, rooted in notions of constitutional due process. The 2003 Advisory Committee Notes explain that the rule was "designed" to help courts "provide an early framework for an eventual fee award, or for monitoring the work of class counsel during the pendency of the action."[61] The rule was also promulgated to help courts meet their duty to "ensure that the amount and mode of payment of

attorney fees are fair and proper whether the fees come from the common fund or are otherwise paid."[62] We are unaware of any case decided under Federal Rule of Civil Procedure 23 before the 2003 amendment that holds that notice to class members is constitutionally required.

Though we believe awarding common fund fees without notice to class members of the fee request was unfortunate, we conclude that due process was not violated under the circumstances of this case. We reach this conclusion not only because due process generally does not require prejudgment notice in 23(b)(2) cases, but also because the process employed here involved a formal request for fees that was energetically opposed by the State and closely scrutinized by the superior court. In light of the relatively small deduction—in both percentage and absolute dollars—to be made from each individual class member's recovery, this process in all likelihood protected the interests of the class as well as if individual notice had been given to class members, and did so without the added costs or delay that would have resulted if notice had been given. In light of these considerations, we conclude that due process was satisfied.

---

when necessary to provide class members an opportunity to signify whether representation by named plaintiffs is fair and adequate or to intervene to present additional claims or to otherwise come into the action to, for example, submit views as amici curiae, does due process require the direction of some sort of notice to absent members of a (b)(2) class."), *aff'd in part and rev'd in part on other grounds sub nom. Califano v. Yamasaki*, 442 U.S. 682, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979).

**58.** *See Goldenberg v. Marriott PLP Corp.*, 33 F.Supp.2d 434, 441 (D.Md.1998) ("Notice of the potential extent of attorneys fee awards is deemed essential because it allows class members to determine the possible influence of the fees on the settlement and to make informed decisions about their right to challenge the fee award." (citations omitted)); *cf. Staton v. Boeing Co.*, 327 F.3d 938, 963 n. 15 (9th Cir.2003) ("Where the class was informed of the amount of fees only indirectly and where the failure to give more explicit notice could itself be the result of counsel's self-interest, the courts must be all the more vigilant in protecting the interests of class members with regard to the fee award.").

**59.** *See* Alaska R. Civ. P. 23(d) (permitting courts to "make appropriate orders ... (2) requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action, or of the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action"); *Larionoff v. United States*, 533 F.2d 1167, 1186 n. 44 (D.C.Cir.1976) (noting that Federal Rule of Civil Procedure 23(d)(2) operates as a "safety valve" under which the court has "discretion ... to direct notice to be given in any class action").

**60.** FED.R.CIV.P. 23(h)(1) & advisory committee note, subdiv. (h) (2003).

**61.** FED.R.CIV P. 23 advisory committee note, subdiv. (h) (2003).

**62.** *Id.; see also Cobell v. Norton*, 407 F.Supp.2d 140, 147 (D.D.C.2005) (stating the "rule was promulgated" for this reason).

## V. CONCLUSION

For the above reasons, we AFFIRM the superior court's judgment in all respects.